**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL GLEBIV, RAYMOND MASSUD, VICKI DALE, GENEVIEVE BOROWSKI, and DONALD HESS individually and on behalf of all others similarly situated, | No. 1:23-cv-16225 |
| Plaintiffs, | **CLASS ACTION** |
| v. | **Jury Trial Demanded** |
| MIDWEST GAMING & ENTERTAINMENT, LLC, d/b/a RIVERS CASINO DES PLAINES, | |
| Defendant. | |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Plaintiffs Michael Glebiv, Raymond Massud, Vicki Dale, Genevieve Borowski, and Donald Hess ("Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Consolidated Class Action Complaint against Defendant Midwest Gaming & Entertainment, LLC, d/b/a Rivers Casino Des Plaines ("Rivers Casino" or "Defendant"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

<u>**INTRODUCTION**</u>

1.     Plaintiffs bring this class action against Defendant for its failure to secure and safeguard their and thousands of other individuals' personally identifying information ("PII"), including names, contact information (such as phone number, email address, and postal address), dates of birth, driver's license or government ID numbers, financial account numbers, tax identification numbers, Social Security numbers, and passport numbers.

2. Rivers Casino operates Rivers Casino Des Plaines, a casino and sportsbook located in Des Plaines, Illinois.

3. On or about August 12, 2023, an unauthorized third party gained access to Rivers Casino's network system and obtained files containing information about Rivers Casino's employees and customers (the "Data Breach").

4. Rivers Casino owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Rivers Casino breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its customers' and employees' PII from unauthorized access and disclosure.

5. As a result of River Casino's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII was exposed as a result of the Data Breach, which occurred on or about August 12, 2023.

6. Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and violations of the Missouri's Merchandising Practices Act, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### *Plaintiff Michael Glebiv*

7.      Plaintiff Michael Glebiv is a citizen of Illinois.

8.      Plaintiff Glebiv obtained gaming services from Rivers Casino. As a condition of receiving services, Rivers Casino required Plaintiff Glebiv to provide it with his PII.

9.      Based on representations made by Rivers Casino, Plaintiff Glebiv believed Rivers Casino had implemented and maintained reasonable security and practices to protect his PII. With this belief in mind, Plaintiff Glebiv provided his PII to Rivers Casino in connection with receiving gaming services provided by Rivers Casino.

10.      At all relevant times, Rivers Casino stored and maintained Plaintiff Glebiv's PII on its network systems.

11.      Plaintiff Glebiv takes great care to protect his PII. Had Plaintiff Glebiv known that Rivers Casino does not adequately protect the PII in its possession, he would not have obtained gaming services from Rivers Casino or agreed to entrust it with his PII.

12.      Plaintiff Glebiv received an email from Rivers Casino informing him that his information was included in the Data Breach.

13.      As a direct result of the Data Breach, Plaintiff Glebiv has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; deprivation of the value of his PII; and overpayment for services that did not include adequate data security.

### *Plaintiff Raymond Massud*

14.      Plaintiff Raymond Massud is a citizen of Missouri.

15.     Plaintiff Massud obtained gaming services from Rivers Casino. As a condition of receiving services, Rivers Casino required Plaintiff Massud to provide it with his PII.

16.     Based on representations made by Rivers Casino, Plaintiff Massud believed Rivers Casino had implemented and maintained reasonable security and practices to protect his PII. With this belief in mind, Plaintiff Massud provided his PII to Rivers Casino in connection with receiving gaming services provided by Rivers Casino.

17.     At all relevant times, Rivers Casino stored and maintained Plaintiff Massud's PII on its network systems.

18.     Plaintiff Massud takes great care to protect his PII. Had Plaintiff Massud known that Rivers Casino does not adequately protect the PII in its possession, he would not have obtained gaming services from Rivers Casino or agreed to entrust it with his PII.

19.     Plaintiff Massud received a notice letter from Rivers Casino informing him that his information was included in the Data Breach.

20.     Since his personal information was compromised in the Data Breach, Plaintiff Massud has received numerous emails and calls from various scammers attempting to get him to sign up for various scams.

21.     As a direct result of the Data Breach, Plaintiff Massud has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; deprivation of the value of his PII; and overpayment for services that did not include adequate data security.

***Plaintiff Vicki Dale***

22.     Plaintiff Vicki Dale is a citizen of Illinois.

23.     Plaintiff Dale obtained gaming services from Rivers Casino. As a condition of receiving services, Rivers Casino required Plaintiff Dale to provide it with her PII.

24.     Based on representations made by Rivers Casino, Plaintiff Dale believed Rivers Casino had implemented and maintained reasonable security and practices to protect her PII. With this belief in mind, Plaintiff Dale provided her PII to Rivers Casino in connection with receiving gaming services provided by Rivers Casino.

25.     At all relevant times, Rivers Casino stored and maintained Plaintiff Dale's PII on its network systems.

26.     Plaintiff Dale takes great care to protect her PII. Had Plaintiff Dale known that Rivers Casino does not adequately protect the PII in its possession, she would not have obtained gaming services from Rivers Casino or agreed to entrust them with her PII.

27.     Plaintiff Dale received an email from Rivers Casino informing her that her information was included in the Data Breach.

28.     As a result of the Data Breach, Plaintiff Dale has been the victim of identity theft. Between September and November, 2023, approximately twelve unauthorized charges appeared on Plaintiff Dale's debit card. In response to these fraudulent charges, Plaintiff Dale was forced to contact her bank, cancel her debit card, and request a new card be issued.

29.     As a direct result of the Data Breach, Plaintiff Dale has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII; deprivation of the value of her PII; and overpayment for services that did not include adequate data security.

***Plaintiff Genevieve Borowski***

30.     Plaintiff Genevieve Borowski is a citizen of Illinois.

31.     Plaintiff Borowski obtained gaming services from Rivers Casino. As a condition of receiving services, Rivers Casino required Plaintiff Borowski to provide it with her PII.

32.     Based on representations made by Rivers Casino, Plaintiff Borowski believed Rivers Casino had implemented and maintained reasonable security and practices to protect her PII. With this belief in mind, Plaintiff Borowski provided her PII to Rivers Casino in connection with receiving gaming services provided by Rivers Casino.

33.     At all relevant times, Rivers Casino stored and maintained Plaintiff Borowski's PII on its network systems.

34.     Plaintiff Borowski takes great care to protect her PII. Had Plaintiff Borowski known that Rivers Casino does not adequately protect the PII in its possession, she would not have obtained gaming services from Rivers Casino or agreed to entrust them with her PII.

35.     Plaintiff Borowski received an email from Rivers Casino informing her that her information was included in the Data Breach.

36.     As a direct result of the Data Breach, Plaintiff Borowski has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII; deprivation of the value of her PII; and overpayment for services that did not include adequate data security.

***Plaintiff Donald Hess***

37.     Plaintiff Donald Hess is a citizen of Wisconsin.

38.     Plaintiff Hess obtained gaming services from Rivers Casino. As a condition of receiving services, Rivers Casino required Plaintiff Hess to provide it with his PII.

39.     Based on representations made by Rivers Casino, Plaintiff Hess believed Rivers Casino had implemented and maintained reasonable security and practices to protect his PII. With

this belief in mind, Plaintiff Hess provided his PII to Rivers Casino in connection with receiving gaming services provided by Rivers Casino.

40.     At all relevant times, Rivers Casino stored and maintained Plaintiff Hess's PII on its network systems.

41.     Plaintiff Hess takes great care to protect his PII. Had Plaintiff Hess known that Rivers Casino does not adequately protect the PII in its possession, he would not have obtained gaming services from Rivers Casino or agreed to entrust it with his PII.

42.     Plaintiff Hess received a notice letter from Rivers Casino informing him that his information was included in the Data Breach.

43.     Since his personal information was compromised in the Data Breach, Plaintiff Hess has received numerous emails and calls from various scammers attempting to get him to sign up for various scams.

44.     As a direct result of the Data Breach, Plaintiff Hess has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; deprivation of the value of his PII; and overpayment for services that did not include adequate data security.

***Defendant Midwest Gaming & Entertainment, LLC, d/b/a Rivers Casino Des Plaines***

45.     Defendant Rivers Casino is a limited liability company formed in Delaware  with its principal place of business at 900 North Michigan Avenue, #1600, Chicago, Illinois 60611. It may be served through its registered agent C T Corporation System, 208 South LaSalle Street, Chicago, Illinois 60604.

## JURISDICTION AND VENUE

46.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed class; and Plaintiff and Defendant are citizens of different states.

47.     This Court has personal jurisdiction over Defendant because Rivers Casino transacts business within this state, and its principal place of business is located within this state.

48.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Rivers Casino*

49.     Defendant operates a casino and sports book in Des Plaines, Illinois. The casino offers slots, table games, and sports betting.[1]

50.     In the regular course of its business, Rivers Casino collects and maintains the PII of its customers and employees. Rivers Casino required Plaintiffs and Class members to provide their PII as a condition of receiving gaming services or employment from Rivers Casino.

51.     Rivers Casino retains and stores this information and derives a substantial economic benefit from the PII that it collects. But for the collection of Plaintiffs' and Class Members' PII, Rivers Casino would be unable to perform its services.

---

[1] *Casino*, RIVERS CASINO, https://www.riverscasino.com/desplaines/casino (last accessed Feb. 26, 2024).

52.     Rivers Casino's website contains a privacy policy which applies to all users of Rivers Casino's services and all visitors to the Rivers Casino property (the "Privacy Policy").[2]

53.     The Privacy Policy acknowledges that Rivers Casino collects extensive information about its customers, including Social Security numbers, financial account information, and demographic information.[3]

54.     The Privacy Policy lists the ways Rivers Casino can use its customers' PII, such as "To provide you with the Services", "To facilitate cash outs and payment of jackpot winnings", "To process cash advances and credit lines", "To carry out appropriate compliance, security, and/or financial checks, including to confirm your identity, [and to] make or receive payments from you", "For analytics for business purposes and business intelligence", and "To process and evaluate your application for employment".[4]

55.     Further, the Privacy Policy enumerates the circumstances in which Rivers Casino can share its customers' PII, including to third-party marketing partners, subsidiaries, and with customers' consent.[5]

56.     Rivers Casino claims to "believe the measures implemented by us reduce the likelihood of security problems to a level appropriate to the type of data involved."[6] It further claims, "We endeavor to apply suitable safeguards to protect the privacy and security of your personal data and to use it only consistent with your relationship with us and the practices described in this Privacy Policy."[7]

---

[2] *Privacy Policy*, RIVERS CASINO (Nov. 1, 2022),
https://www.riverscasino.com/desplaines/privacy-policy (last accessed Feb. 26, 2024).
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

57.    Plaintiffs and Class members are current or former customers or employees of Rivers Casino and entrusted Rivers Casino with their PII.

### *The Data Breach*

58.    On or about August 12, 2023, "an unauthorized actor gained access to Rivers Casino's systems on or around August 12, 2023, and as a result likely obtained some information."[8] After an investigation, Rivers Casino "determined that files containing certain personal information of Rivers Casino Des Plaines Team Members, customers, and online sportsbook customers" were accessed or removed during the Data Breach.[9]

59.    According to the Notice of Data Security Incident posted on Rivers Casino's website, the "affected information included name, contact information (such as phone number, email address, and postal address), date of birth, driver's license or government ID number" and, for some Class members, "financial account number, tax identification number, Social Security number, and/or passport number."[10]

60.    Though Rivers Casino learned of the Data Breach on or about August 12, 2023, it waited until November 16, 2023, over three months later, to begin notifying its customers and employees that their PII was in the hands of cybercriminals.[11]

61.    Rivers Casino's failure to promptly notify Plaintiffs and Class members that their PII was accessed and stolen virtually ensured that the unauthorized third parties who exploited

---

[8] *Notice Letter*, RIVERS CASINO (Nov. 22, 2023), available at
https://apps.web.maine.gov/online/aeviewer/ME/40/dbfe4012-3523-4af3-8be8-
f8673bd8aa0a.shtml (under heading titled "Notification and Protection Services" click link titled "Rivers_Casino_-_ME_AG_Notice_Letter_32903832v1.pdf").
[9] *See id.*
[10] *Notice of Data Breach*, RIVERS CASINO (Nov. 16, 2023),
https://www.riverscasino.com/desplaines/statements-and-releases-rivers-casino-des-plaines.
[11] *See id.*

those security lapses could monetize, misuse, or disseminate that PII before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### Rivers Casino Knew that Criminals Target PII

62.     At all relevant times, Rivers Casino knew, or should have known, that the PII that it collected and stored was a target for malicious actors. Despite such knowledge, Rivers Casino failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII from cyberattacks that Rivers Casino should have anticipated and guarded against.

63.     It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as the Social Security numbers ("SSNs") and medical information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[12]

64.     PII is a valuable property right.[13] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within

---

[12] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.
[13] *See* Marc van Lieshout, *The Value of Personal Data*, 457 INT'L FED'N FOR INFO. PROCESSING 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

the existing legal and regulatory frameworks."[14] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[15] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[16] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[17] Users of the personal data collection app Streamlytics can earn up to $200 a month by selling their personal information to marketing companies who use it to build consumer demographics profiles.[18]

65.    This information is also valuable to identity thieves and fraudsters and once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

66.    As a result of the real and significant value of this material, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

---

[14] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.
[15] *See* IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, iAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.
[16]    *See*    https://www.standardbank.co.za/southafrica/personal/products-and-services/security-centre/bank-safely/bank-securely-with-a-digital-id (last accessed Feb. 27, 2024).
[17]    *See* Nielsen Computer & Mobile Panel, *Frequently Asked Questions,* available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed Feb. 27. 2024).
[18]    *See* How To Sell Your Own Data And Why You May Want to, available at https://www.mic.com/impact/selling-personal-data-streamlytics (last accessed Feb. 27, 2024).

67.     Consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[19]

68.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII Has Grave and Lasting Consequences for Victims*

69.     Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[20] [21]

70.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

---

[19] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[20] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Feb. 26, 2024).

[21] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[22]

71.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[23]

72.     Theft of SSNs also creates a particularly alarming situation for victims because SSNs cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN. Thus, a new SSN will not be provided until after the harm has already been suffered by the victim.

73.     Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[24]

74.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately

---

[22] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[23] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Feb. 26, 2024).

[24] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[25]

75.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

76.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victims.

77.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[26]

---

[25] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[26] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),

78.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

79.     The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

80.     The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data of Plaintiffs and Class members. Cybercriminals can then use this information to misrepresent their identity to gain access to financial and other accounts by providing verifying information compiled from unique sources.

81.     Thus, even if certain information was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package that can be used to impersonate a victim and gain access to credentialed accounts or to fain additional personal information.

82.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

83.     It is within this context that Plaintiffs and Class members must now live with the knowledge that their PII is forever in cyberspace, having been stolen by criminals willing to use

---

https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last accessed on Feb. 27, 2024).

the information for any number of improper purposes and scams, including making the information available for sale on the black market.

*Damages Sustained by Plaintiffs and Class Members*

84. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

## CLASS ALLEGATIONS

85. This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

86. Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

> All United States residents whose PII was accessed by and disclosed to unauthorized persons in the Data Breach, including all who were sent a notice of the Data Breach.

87. Excluded from the Class are Midwest Gaming & Entertainment, LLC, d/b/a Rivers Casino Des Plaines, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

88.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

89.     The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Rivers Casino has yet to reveal the exact number of individuals affected by the Data Breach, but it reported to the Attorney General of Texas that 13,637 Texas residents alone were impacted.[27]

90.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.  Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII from unauthorized access and disclosure;

b.  Whether Defendant had duties not to disclose the PII of Plaintiffs and Class members to unauthorized third parties;

c.  Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII;

d.  Whether an implied contract existed between Class members and Defendant, providing that Defendant would implement and maintain reasonable security measures to protect and secure Class members' PII from unauthorized access and disclosure;

e.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class members;

f.  Whether Defendant breached its duties to protect Plaintiffs' and Class members' PII; and

---

[27] *Data Security Breach Reports*, ATT'Y GEN. OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last accessed Feb. 27, 2024).

        g.   Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

91.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

92.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

93.    Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

94.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

95.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

96.     Rivers Casino owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting the PII in its possession, custody, or control.

97.     Rivers Casino knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII and the importance of maintaining secure systems. Rivers Casino knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

98.     Given the nature of Rivers Casino's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Rivers Casino should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

99.     Rivers Casino breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiffs' and Class members' PII.

100.    It was reasonably foreseeable to Rivers Casino that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to design, adopt,

implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII to unauthorized individuals.

101.     But for Rivers Casino's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII would not have been compromised.

102.     As a result of Rivers Casino's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Rivers Casino's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**
**NEGLIGENCE PER SE**

103.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

104.     Rivers Casino's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including,

as interpreted by the FTC, the unfair act or practice by business, such as Rivers Casino, of failing to employ reasonable measures to protect and secure PII.

105.    Rivers Casino's duties also arise from the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS. 530/45.

106.    Additionally, under 815 ILCS 530/10, Rivers Casino had a duty to "notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach […] in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10,

107.    Rivers Casino violated Section 5 of the FTCA and IPIPA by failing to use reasonable measures to protect Plaintiffs' and other Class members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. Rivers Casino's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

108.    Rivers Casino's violation of IPIPA and Section 5 of the FTCA constitutes negligence per se.

109.    Plaintiffs and Class members are within the class of persons that IPIPA and Section 5 of the FTCA were intended to protect.

110.    The harm occurring as a result of the Data Breach is the type of harm that IPIPA and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement

actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Brach.

111.    It was reasonably foreseeable to Rivers Casino that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class members' PII to unauthorized individuals.

112.    The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Rivers Casino's violations of IPIPA and Section 5 of the FTCA. Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Rivers Casino's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF IMPLIED CONTRACT

113.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

114.    In connection with receiving gaming services, Plaintiffs and all other Class members entered into implied contracts with Rivers Casino.

115.    Pursuant to these implied contracts, Plaintiffs and Class members paid money to Rivers Casino and provided Rivers Casino with their PII. In exchange, Rivers Casino agreed to, among other things, and Plaintiffs understood that Rivers Casino would: (1) provide services to Plaintiffs and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII; and (3) protect Plaintiffs' and Class members' PII in compliance with federal and state laws and regulations and industry standards.

116.    The protection of PII was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and Rivers Casino, on the other hand. Had Plaintiffs and Class members known that Rivers Casino would not adequately protect its clients' PII, they would not have received gaming or other services from Rivers Casino.

117.    Plaintiffs and Class members performed their obligations under the implied contract when they provided Rivers Casino with their PII and paid for gaming or other services from Rivers Casino.

118.    Rivers Casino breached its obligations under its implied contracts with Plaintiffs and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII in a manner that complies with applicable laws, regulations, and industry standards.

119.     Rivers Casino's breach of its obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

120.     Plaintiffs and all other Class members were damaged by Rivers Casino's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

121.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

122.     This claim is pleaded in the alternative to the breach of implied contract claim.

123.     Plaintiffs and Class members conferred a monetary benefit upon Rivers Casino in the form of monies paid for gaming services, or in the form of labor which enabled Rivers Casino to run its business, and through the provision of their PII.

124.     Rivers Casino accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. Rivers Casino also benefitted from the receipt of Plaintiffs' and Class members' PII, as this was used to facilitate services.

125.    As a result of Rivers Casino's conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between their payments made or labor with reasonable data privacy and security practices and procedures that Plaintiffs and Class members paid for, and those payments or labor without reasonable data privacy and security practices and procedures that they received.

126.    Rivers Casino should not be permitted to retain the money belonging to Plaintiffs and Class members because Rivers Casino failed to adequately implement the data privacy and security procedures for itself that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

127.    Plaintiffs and Class members have no adequate remedy at law.

128.    Rivers Casino should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT V
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, *et seq*. ("ICFA")

129.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

130.    Rivers Casino offered and continues to offer gaming and other services in the State of Illinois.

131.    Plaintiffs and Class members purchased and received gaming or other services from Rivers Casino for personal, family, or household purposes.

132.    Rivers Casino engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security measures to protect and secure its

26

clients' PII in a manner that complied with applicable laws, regulations, and industry standards.

133.    Rivers Casino makes explicit statements to its patients that their PII will remain private.

134.    Rivers Casino's duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. Rivers Casino violated this duty by failing to implement reasonably secure data security policies.

135.    Rivers Casino further violated the ICFA by failing to notify its current and former patients of the data breach in a timely manner. The Illinois Personal Information Protection Act requires entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

136.    Due to the Data Breach, Plaintiffs and Class members have lost property in the form of their PII. Further, Rivers Casino's failure to adopt reasonable practices in protecting and safeguarding its clients' PII will force Plaintiffs and Class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Rivers Casino's practice of collecting and storing PII without appropriate and reasonable safeguards to protect such information.

137.     As a result of Rivers Casino's violations of the ICFA, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Rivers Casino's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT VI**
**VIOLATIONs OF MISSOURI'S MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. § 407.005, *et seq*.**

138.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

139.     Plaintiff Massud brings this claim on behalf of all Class members who are citizens of Missouri.

140.     The Missouri Merchandising Practices Act ("MMPA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . whether committed before, during or after the sale, advertisement or solicitation." Mo. Rev. Stat. § 407.020(1).

141.     Rivers Casino is a "person" as defined in the MMPA. Mo. Rev. Stat. § 407.010(5). The gaming services provided by Rivers Casino are "merchandise" within the meaning of the

28

MMPA. Mo. Rev. Stat. § 407.010(4). Rivers Casino is and was engaged in "trade" or "commerce" under the MMPA. Mo. Rev. Stat. § 407.010(7).

142.    Rivers Casino engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts regarding its inadequate data security. Rivers Casino's conduct, as described herein, in misrepresenting the adequacy of its data security systems, constitutes an unfair and deceptive practice and was likely to mislead a reasonable consumer.

143.    A reasonable consumer would consider the adequacy of a company's data security to be a material fact when making a decision whether to obtain services from the company and provide the company with its PII. Knowing this, Rivers Casino misrepresented that it had adequate data security.

144.    Plaintiff Massud obtained the gaming services from Rivers Casino for personal, family, or household use. In doing so, Plaintiff Massud and Class members acted reasonably in relying on Rivers Casino's unfair practices as described herein, including Rivers Casino's representation that it had adequate data security to protect Plaintiff Massud's and Class members' PII.

145.    As a result of their reasonable reliance on Rivers Casino's deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts regarding the Class Vehicles, Plaintiff Massud and Class members incurred damages, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the

continued risk to their PII which remains in Rivers Casino's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

146.     Plaintiff seeks all relief authorized under the MMPA, including attorney's fees, punitive damages, and such equitable relief as the Court deems proper to protect Plaintiff and Class members from Rivers Casino's unlawful actions as describe herein.

<u>**PRAYER FOR RELIEF**</u>

Plaintiffs, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.     Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.     Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.     Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

### **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: February 28, 2024                                Respectfully submitted,

                                                        /s/ Ben Barnow
                                                        Ben Barnow
                                                        Anthony L. Parkhill
                                                        Riley W. Prince
                                                        Nicholas W. Blue
                                                        **BARNOW AND ASSOCIATES, P.C.**
                                                        205 West Randolph Street, Suite 1630
                                                        Chicago, IL 60606
                                                        Tel: 312-621-2000
                                                        Fax: 312-641-5504
                                                        b.barnow@barnowlaw.com
                                                        aparkhill@barnowlaw.com
                                                        rprince@barnowlaw.com
                                                        nblue@barnowlaw.com

                                                        *Attorneys for Plaintiffs Dale and Borowski*

                                                        Gary M. Klinger
                                                        **MILBERG COLEMAN BRYSON**
                                                        **PHILLIPS GROSSMAN, LLC**
                                                        227 W. Monroe Street, Suite 2100
                                                        Chicago, IL 60606
                                                        Tel: 866-252-0878
                                                        Email: gklinger@milberg.com

                                                        *Attorney for Plaintiff Glebiv*

                                                        Carl V. Malmstrom
                                                        **WOLF HALDENSTEIN ADLER**
                                                        **FREEMAN & HERZ LLC**
                                                        111 W. Jackson Blvd., Suite 1700

Chicago, IL 60604
Tel: 312-984-0000
Fax: 212-686-0114
malmstrom@whafh.com

*Attorney for Plaintiff Massud*

John D. Blythin
**ADEMI LLP**
3620 E. Layton Ave.
Cudahy, WI 53110
Tel: (414) 482-8000
Fax: (414) 482-8001

*Attorney for Plaintiff Hess*